H. C. Berry, Receiver for Birmingham Packing Company, Name Changed to Southern Packing Company, a Corporation v. Commissioner.
Berry v. Commissioner
Docket No. 404 P.T.
United States Tax Court
1944 Tax Ct. Memo LEXIS 383; 3 T.C.M. (CCH) 91; T.C.M. (RIA) 44031; February 3, 1944
*383 Theodore B. Benson, Esq., for the petitioner. Irene S. Scott, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding is brought to review the disallowance by respondent of petitioner's claim, filed under Title VII of the Revenue Act of 1936, for the refund of processing tax. The amount claimed in the petition is $37,052.95. Petitioner now claims the full amount of the tax paid, which was $43,393.60. The issue presented is whether petitioner bore the burden, in whole or in part, of any amount paid as processing tax under the Agricultural Adjustment Act, and, if so, to what extent. The proceeding was commenced before the Processing Tax Board of Review which conducted hearings but had made no findings nor decision at the time of the transfer to this Court under Revenue Act of 1942, section 510. An application by petitioner for further hearing to complete the record was granted by this Court and pursuant thereto further hearings were had and completed. Findings of Fact Petitioner is the Receiver of the Southern Packing Company, formerly named the Birmingham Packing Company, an Alabama corporation, which during the period in question was *384 engaged in the slaughtering business in Birmingham, Alabama. For convenience any of the above-named may hereinafter be referred to as petitioner. Petitioner's plant and other operating assets were sold April 4, 1936, when it ceased operation of its meat processing. The Receiver was appointed November 18, 1936. In the operation of its business petitioner slaughtered and processed hogs and cattle, and upon a few occasions sheep and goats; it produced and sold ice; and it conducted branch wholesale stores in Birmingham, Dothan, and Gadsden, Alabama, and in Washington, D.C., which stores were outlets for petitioner's products, and also sold products purchased for resale. The hogs processed by petitioner during the periods in question were purchased by it locally and in Missouri, Kentucky, Iowa, Nebraska, Illinois, Tennessee, southern Alabama, and Florida. The hogs purchased from the area above the parallel of latitude running through Montgomery, Alabama, were generally corn-fed hogs, and those purchased from areas below that parallel were generally peanut-fed. The corn-fed hogs produce better pork products than peanut-fed hogs, and command more money; all of the cuts from corn-fed *385 hogs are heavier. Hogs from the area south of the Montgomery parallel are discriminated against in the northern markets; they are placed in a quarantine division, and do not bring as much money. Petitioner during the periods in question purchased approximately 45,340 hogs from the area above this parallel and approximately 2,420 hogs from the area below this parallel. Inspectors for the Federal Government examined the condition of all of the hogs received and killed by petitioner. Hogs purchased and slaughtered by petitioner averaged 202 pounds in weight and were good grade hogs. Petitioner processed its hogs for sale as fresh loins, as fresh or cured hams, shoulders and bacon, and as sausage, prepared ham, and similar products. In addition to the cuts derived from the hog petitioner sold lard, feet, tankage, tallow, and a few casings. Trimmings were not sold, but went into sausage or lard. During the tax period and the period before and after the tax petitioner sold approximately 90 percent of hams in a cured or smoked state, and 50 percent of shoulders cured. All bellies processed by petitioner were sold in a cured or smoked state. All loins were sold fresh. The cattle were generally *386 sold in halves and quarters. During the tax period and during the period before and after the tax, depending upon the size, it took petitioner from 30 to 60 days to cure hams, from 20 to 45 days to cure shoulders, and from 10 to 21 days to cure bellies and bacon. Petitioner used certain of its hog products in the manufacture of sausage, consisting of fresh sausage (loose and link), frankfurters and liver sausage, a so-called mixed sausage, and an article called prepared ham. Some of the sausage which petitioner manufactured contained both pork and beef, usually a 50-50 mixture. The prepared ham and the mixed sausage had 50 percent pork (trimmings) and 50 percent beef. It made bologna which was all beef and beef hearts. Petitioner during January, February, and March, 1934, performed certain custom processing for the Federal government for which it received a fee and in addition, the right to retain certain parts of the animals slaughtered. The processing tax on the part going to the Government has been refunded, and it has been eliminated from the tax paid. The retained part amounted to about 25 percent of the entire hog. Processing tax on this has been paid and is included in the *387 amount of tax paid as hereinafter set forth. In 1933 it slaughtered hogs and sold pork therefrom to the Government, as it would to other customers, under the program of the Federal Surplus Relief Corporation. Petitioner made up its weekly selling price lists for pork and pork products on the basis of a 20 percent mark-up over the amount it was currently paying for live hogs. It usually revised its price lists early each week. During the period the processing tax was in effect petitioner included the amount of the processing tax as a part of the cost of the live hogs before applying the 20 percent mark-up to determine the selling price of its products. Petitioner's prices were subject to possible adjustment to meet the price of its competitors in Birmingham. The prices of pork and pork products in Birmingham were influenced by the Chicago market. Chicago packers tried to sell pork in Birmingham at one cent above the Chicago prices but were not always able to do so. As a general thing, pork products sell for a higher price in Birmingham than in Chicago. Petitioner's sales tickets which might form a basis for showing the gross sales prices of beef and pork, respectively, cannot be *388 located after diligent search, except for the period April, 1934, through December, 1935. These tickets show the gross sales prices of all of petitioner's products, and do not of themselves disclose gross sales prices for the processed commodity, as such. The tables and data contained in a publication of the United States Department of Agriculture, Bureau of Agricultural Economics, entitled "Prices of Hogs and Hog Products, 1905-1936," and prepared by Arthur T. Edinger, Associate Marketing Specialist, show the monthly average wholesale prices of hogs and hog products based on sales at Chicago, Illinois. They are based generally upon hogs averaging 200-220 pounds of United States "good" or "choice" grade, sometimes referred to as "butcher hogs" the cuts from which are especially suitable for the retail trade. The average yield of hogs in their various cuts and products is also shown. The figures appearing in this publication, which is petitioner's Exhibit 57, accurately reflect the average situation with respect to the various figures given. During the period November 5, 1933, to February 28, 1935, i.e., the tax period, petitioner paid $43,393.60 as processing tax, the last amount *389 paid as processing tax being applicable to the month of February, 1935. During this period petitioner processed for itself 33,587.73 cwt. preslaughter weight of hogs. Their cost (less condemnations), including freight, was $161,966.89 and their purchase invoice weight was 35,905.91 cwt. [1] The latter included petitioner's retained portion (25 percent) of the hogs slaughtered by it for the Government, as hereinbefore mentioned. For January, February, and March, 1934, the invoice purchase weight of petitioner's total slaughter, the invoice purchase weight of its retained portion of Government slaughter, the total of the foregoing, the invoice purchase weight of the Government's portion of the slaughter and the total slaughter were as follows: [2]
Jan.
Feb.
Mar.
Total
Petitioner's own purchases
3,539.55
2,275.45
1,779.25
25% of Government slaughter retained
552.39
321.22
141.69
1,015.30
Total slaughter retained by petitioner (tax paid)
4,091.94
2,596.67
1,920.94
Government's 75% of Government slaughter
1,657.17
963.66
425.07
3,045.90
Total slaughter
5,749.11
3,560.33
2,346.01
*390 During the period November 5, 1931, to November 5, 1933, and February 1, 1936, to March 31, 1936, the periods before and after the tax, respectively, i.e., the base period, petitioner processed 66,644.91 cwt. of pre-slaughter weight hogs. Their cost (less condemnations), including freight, was $285,086.04, and their invoice purchase weight was 71,244.69 cwt. During the tax period petitioner sold tankage, grease, etc., attributable to hogs for $1,795, and during the base period sold such tankage for $1,464.68. Application of Edinger's Table 37 to the monthly figures forming, in their aggregate, petitioner's total invoice purchase weights, results in a gross sales value of petitioner's pork products, except tankage, etc., for the tax period of $309,116.25, and for the base period of $479,608.59. Table 37 is based *391 on the premise that all hams and picnics are cured, whereas, petitioner, as above stated, cured only 90 percent of its hams and 50 percent of its picnics. A gross sales value computation adjusted to compensate for these facts, by the use of other indicated tables from Edinger, results in a value of $305,168.87 for the tax period and a value of $463,746.64 for the base period. A further adjustment by reason of the fact that petitioner's retained portion of January, February, and March, 1934, Government slaughter was composed solely of lard and minor parts, results in a gross sales value for the tax period of $302,545.32. The cost of the articles processed, including freight, during the tax period, plus the amount of tax ultimately paid, less condemnations, equals $205,360.49. For the base period, the cost of articles processed, including freight, less condemnations, equals $285,086.04. Using the figures last appearing above and applying the statutory formula for determining the extent to which petitioner has passed on the processing tax, it is found that the average margin per unit of the commodity processed during the tax period was $2.9469, and during the base period $2.7027, *392 resulting in a margin unfavorable to petitioner of $0.24414824 per cwt. of hogs processed. A margin determined by the use of Table 37 without any of the above-indicated adjustments is unfavorable to petitioner to the extent of $0.28874573. During the base period petitioner purchased 85,040.57 cwt. of cattle, invoice purchase weight, for its own processing; during the tax period it purchased 78,990.50 cwt. of cattle, invoice purchase weight. On a poundage basis 45.58 percent of petitioner's processing during the base period consisted of hogs; and during the tax period 31.25 percent consisted of hogs. The total expenses of all kinds, exclusive of depreciation, incurred by the taxpayer in its business of pork and beef processing, production and selling of ice, reselling outside purchases, and custom processing were $333,574.37 during the tax period and were $380,285.72 during the base period. As part of its pork processing petitioner operated a refrigeration and chilling department which enabled it to manufacture ice as a byproduct, which it sold at about $3.50 per ton to a retailer of ice. The ice manufacturing was by the tank process and used the same refrigerants and the same *393 power as were used in connection with the chilling operation in the packing plant. Cost of ice operations were not included in profit and loss reports prior to January 1, 1933, but were thereafter. From January, 1933, through October, 1933, and February through March, 1936, petitioner sold 8,592 tons of ice; during the tax period it sold 9,155 tons. The cost of manufactureing the ice was $2 per ton. The cost of selling petitioner's purchase pork was not less than $2,362.55 for the tax period and $3,402.12 in the base period. Expenses attributable to that portion of January, February, and March, 1934, slaughter which went to the Government were $7,519.20. If all expenses noted above incurred by petitioner during the tax period are allocated between hog and cattle processing on a poundage basis, and deductions are made for the expenses attributable to ice, Government slaughter, and selling expenses, the sum of $88,638.37 would be allocable to hogs. Under a similar computation for the base period, except for absence of Government slaughter therein, the sum of $162,099.64 would be allocable to hogs. A division of these allocable expenses by the number of cwts. processed (invoice purchase *394 weight) results in expense allocable to a cwt. of hogs in the tax period of $2.46862 and in the base period of $2.5752, or an excess per cwt. tax period expenses for hogs of $0.19337. Petitioner at the beginning of the tax period was handicapped by a lack of working capital. At the time the tax on the processing of hogs became effective on November 5, 1933, petitioner had already borrowed about all of the money it could borrow. On December 31, 1932, its bank loans were $199,867.33; on December 31, 1934, they were $244,289.27. It had deficit balances on the dates and in the amounts indicated, as follows: November 1, 1933
$222,332.03
December 31, 1933
223,326.76
December 31, 1934
243,535.49
December 31, 1935
299,836.51
December 31, 1936
457,479.78
It had notes and accounts receivable on the dates and in the amounts indicated, as follows: December 31, 1932
$ 76,740.41
December 31, 1933
87,406.55
December 31, 1934
97,214.50
May 5, 1936 (charged off
as worthless)
95.031.23
Petitioner filed an unjust enrichment tax return for 1935 and returned no tax due, which return was marked "Non-taxable" and "Closed" by respondent. The excess margin in the tax period *395 per cwt. over the margin in the base period is in excess of the amount of increased expenses per cwt. determined on the allocation between beef and pork on the poundage basis. Petitioner did not bear the burden of any amount paid by it as processing tax on the processing of hogs. Opinion Although petitioner concedes, as is evident from figures introduced by him, that the statutory computation leads to a prima facie case against him, an intricate calculation is submitted in rebuttal to overcome this unfavorable result. In effect the purpose is to show that by departing from the statutory method of determining margins and resorting to an attempt to establish net profits per unit processed, a greater loss can be shown in the tax period than the base period, and hence presumably there can be demonstrated an absorption of the tax. As nearly as can be gathered, this result is the outcome of a per unit cost of production asserted to be higher in the tax period. It should be said by way of introduction that at no point is there a suggestion by petitioner as to what the statutory margin actually is. This has necessitated the assumption by us of some figure by reason of our view that *396 the essence of the rebuttal argument requires a determination of whether in fact the resulting figures are sufficient to overcome the unfavorable margin of the prima facie case. The first difficulty in this operation lies in the fact that the petitioner's presently available records are quite incomplete. In order to establish any gross sales value, it has been necessary to resort to a formula which is furnished by studies known as Edinger's Tables, which were introduced in evidence and which purport to show average results of processing and average selling prices. Accepting these as adequate proof of the actual figures in petitioner's particular situation, taking the table most favorable to petitioner, and disregarding the fact that "cutting" tests or similar records of petitioner's actual operations are unavailable even for the purpose of corroboration, Ohio Provision Co. v. Commissioner (U.S. Processing Tax Board of Review), Docket No. 51, decided September 27, 1939, it would still be necessary to make certain adjustments to reflect differences between petitioner's conceded methods of operation and the assumption upon which the Edinger Tables are based. Primarily, this *397 arises because part of petitioner's production of hams and picnics was sold on a fresh basis rather than cured as is assumed in the Edinger Table in question (No. 37). The record is not clear as to the bacon, but even though the point seems to be conceded in petitioner's brief, we have given him the benefit of disregarding this item. The evidence indicates, however, and we have found as a fact that only about 50 percent of the picnics and 90 percent of the hams were smoked or cured. The adjustment in question, if it were carried through to the minutest possible detail, would involve a vast number of separate arithmetical processes, and the importance of so accurate a determination, bearing in mind the question before us, does not demonstrate itself to our satisfaction. We have accordingly employed the following formula for arriving at roughly accurate adjustments and have adopted the ultimate figure so computed as our finding of fact. The pounds of ham and picnic per average cwt. of hog were first taken from Edinger's Table No. 1. The difference in price for each relevant month between fresh and cured ham and fresh and cured picnic was then abstracted from Edinger's Tables 3 and *398 7, and 4 and 9, respectively, and applied to the appropriate poundage, but since only one-half of the picnics and one-tenth of the hams needed adjustment, the respective figures were accordingly divided in the one case by 10 and in the other case by 2, and the resulting total was subtracted from the monthly figure shown on Edinger's Table 37. [3]
When the difference so obtained is multiplied by the number of cwt. put into process for each month of the two periods the adjusted gross sales value for which this operation is designed appears. No effort has been made to carry the result out beyond the first few decimal places, and this applies particularly to the computation involving the proportionate weight of hams and picnics. An attempt has been made to employ a weighted average of fresh and smoked meat since fresh hams bear a slightly higher *399 relation to the total dressed weight than is the case with smoked hams. But in applying the resulting figure we have used the neafest even fraction in preference to a complicated decimal computation. A similarly computed adjustment has been made to allow for the specific products which petitioner was permitted to retain as its portion of hogs slaughtered for the Government, and to which further reference will be made. No adjustments have been attempted either for variations between prices in petitioner's locality and those at Chicago (which Edinger uses) nor for possible lags in the time of processing due to delays in the curing process, neither of which, in petitioner's view, would materially affect the result. In view of the fact that all of these adjustments, which seem to us indispensable, were furnished by neither party, we are unable to see that either is in a position to complain that the result may be no more than a close approximation. The results, as appear from our findings, are that the statutory margin is unfavorable to petitioner to the extent of $0.28874573 without adjustment, and of $0.24414824 if adjusted by the process we have described. In construing and applying *400 petitioner's rebuttal contention, we have reached the conclusion that the generating principle upon which the proceeds cannot helpfully be applied in the solution of the present problem. If it were permissible to do no more than show that net profits in the tax period were less or net losses greater, and to conclude therefrom that the tax had been absorbed, the precise and minute formula prescribed by the statute would have little or no justification. See ; , affirmed (C.C.A., 8th Cir.), , certiorari denied, ; , affirmed (C.C.A., 4th Cir.), . Petitioner concedes that the statutory margin results unfavorably to him and he is thereby thrown upon those portions of the statute which deal with the case in rebuttal. The acceptable evidence is limited by section 907 (e) to "proof of the actual extent to which the claimant *401 shifted to others the burden of the processing tax" [emphasis added]. Our interpretation of the nub of petitioner's position is an assertion by him that the costs of production increased during the tax period and hence that they, rather than the burden of the tax, account for the higher margin. A showing of this fact in rebuttal is expressly permitted by section 907 (e) (1) (B), but to succeed under this provision a change in the cost of production must be "clearly shown." No over-all general computation of net profits, particularly when it derives its justification from an allocation of costs among taxed and untaxed products, can furnish this clear showing or prove the actual extent of any shift of the tax burden. See Revenue Act of 1936, section 907 (e) (2). At the cost of some difficulty and effort we have accordingly examined the underlying figures in order to satisfy ourselves whether a justifiable application of petitioner's contention can possibly lead to a conclusion favorable to him, and have arrived at the view that the figures shown by the record do not lead to any such possibility. In a business which, like petitioner's, produced three types of salable products, and *402 of which we are concerned with only one as the subject of processing tax, any arbitrary allocation of costs presents obvious difficulties. But petitioner's books make no effort to segregate expenses attributable to hog processing and in order to procure any figures for this purpose some formula of allocation must be devised. In this connection a number of questions arise. The principal operations were the slaughter of cattle and the slaughter of hogs. In the absence of a more evidently equitable method the expenses have been divided, as petitioner insists they may be, on the basis of poundage of the respective animals slaughtered. We shall assume for present purposes, without deciding, that a convincing allocation of costs can be made, and that poundage is a sound basis upon which to make it. Petitioner urges that the comparison should be made by using the figures for "dressed weight," that is, the weight of the products after the slaughtering operations and various intermediate processes have been completed. Since figures produced by petitioner indicate that the dressed weight of hogs compared to the invoice weight is considerably more than in the case of cattle, the effect of such *403 a procedure would be to attribute to hogs a higher portion of the total cost. We are, however, engaged in an attempt to allocate the entire costs of operation, and hence we regard as preferable the invoice-weight figures. They most nearly show the total originally put into process. They give the comparative weights of the raw material as it is acquired by petitioner and prior to the impact of any of the costs of processing and operation, some of which, obviously, would be attributable to phases of the process earlier than the production of the "dressed" product. A disproportionate concentration of such costs attributable to cattle would cause an actual distortion of the comparison of the dressed weight, were it to be used. A further advantage of the use of invoice weight is that it is possible to employ the same figures as those used in computing the gross sales value from the Edinger Tables. There has been no vestige of a showing that, if an allocation of costs is possible, one calculated on the basis of invoice weight produces inequitable results. And neither party contends that an intermediate figure of "pre-slaughter" weight should be used for this purpose, nor are the figures *404 necessary for this apparent from the record. Another commodity produced and sold by petitioner, the costs of production of which are included in the total, is ice. Evidence produced by petitioner indicates that $2 a ton is an appropriate amount to allocate to the cost of producing this article, and this figure, as well as the quantity of ice produced, has been accepted as accurately computed by petitioner. Since, however, this is not a proportionate figure, but one purporting to show the total cost allocable to the production of ice, we have deducted the entire amount from petitioner's expenses before making the allocation as between hogs and cattle. Two other deductions are necessary before the figure in question can be accepted even as an approximation. Petitioner concedes that certain comparatively insignificant costs of selling pork products not processed by it are a proper deduction from the cost figures, and we have accepted the amounts which petitioner suggests in this respect. Secondly, we have found it necessary to deduct from the cost attributable to hogs in the tax period a figure to represent the cost of slaughtering hogs which did not belong to petitioner and with respect *405 to which it was performing a purely service function. This operation went forward under contracts with the Government. Except for 25 percent of the resulting production, petitioner did not own the processed articles, did not sell them, and ultimately paid no tax thereon. It received its compensation for the services so rendered, but cannot be considered as having any claim in this proceeding to that extent. See . Since, however, part of its entire expense was necessarily attributable to the operations connected with the Government slaughter, we view some adjustment in this respect as necessary and have made it on the basis that the poundage of Government hogs not retained by petitioner bears to the total poundage processed. Finally, petitioner's proposed computation of costs and the allocation thereof to the respective products is computed by months - a procedure we think unjustifiable, bearing in mind that a large segment of the expenses of any business paid in one month is necessarily attributable to at least a year or to an even longer period and that there is no indication *406 that, or to what extent, petitioner's business constitutes any exception to this rule. In this respect we have accordingly employed the total figures for expenses shown for each period without however departing from the constituent items introduced and employed by petitioner. We have included in our findings $0.19337 as the excess tax period cost of production per cwt. which results from the computations just described. It is apparent that assuming an allocation of cost as arbitrary as that so described, and making a number of other assumptions in petitioner's favor, to which respondent objects, the purported increase in tax period costs of production is not sufficient to overcome the adverse margin whether the adjusted or unadjusted figure be used in that respect. The foregoing considerations make it unnecessary to decide whether a decision in favor of respondent might not be required on an entirely collateral ground. Petitioner's testimony shows that in establishing the selling prices of its products, it first included a specified element sufficient to cover the entire tax. Even a prima facie case in petitioner's favor might fall in the face of such a situation. . *407 And, of course, even to a greater extent might this require disregard of any mere rebuttal contention. The extensive efforts and considerable time devoted to the presentation of this proceeding, however, have inclined us to prefer an examination of the substance and equities of the claim over a disposition which might be viewed as excessively technical. But since either approach brings us to the same result further discussion of the latter issue is clearly surplusage. We conclude that no refund is due. Decision will be entered for respondent. Footnotes
1. This figure is taken from an exhibit said to have been prepared by respondent, introduced by petitioner, and agreed upon as correct by both parties at the hearing.↩
2. These figures are a reconciliation of the figures referred to in the foregoing footnote which show petitioner's invoice purchase weight for the months in question, together with petitioner's 25 percent of Government slaughter, and Exhibit 68, which shows petitioner's invoice purchase weight, exclusive of any Government slaughter, as taken from petitioner's books.↩
3. The detail of the figures in the Edinger Tables has been omitted from our findings in the interest of brevity, and due partly to the fact that they purport to be a publication of the Department of Agriculture, dated June, 1937, to which presumably public access is easy, and as to the contents of which any court may take judicial notice.↩